## CIRCUIT COURT OF CLARKE COUNTY

George T. Ball

v.

Sherman P. Ball et al.

January 19, 1984

Case No. (Chancery) 2389

BY JUDGE ROBERT K. WOLTZ

This suit is one for declaratory judgment to construe the will of Horace T. Ball. The construction involves to whom did he devise his real estate.

At the time of executing his will November 1, 1961, Horace Ball was unmarried and unsurvived by issue but survived by certain collateral kindred. About ten months later, the testator died still without surviving issue but survived by these same collaterals and survived by a wife, Lena D. Ball, formerly Lena Davis. She died testate in 1981 purporting to devise the real estate mentioned in the testator's will to the complainant, who is one of testator's collateral survivors. The defendants are the testator's remaining surviving collaterals.

After directing payment of debts, etc., the will provides as follows:

> SECOND: I give and bequeath all my personal property to my friend, Lena Davis, in fee simple and absolutely, without restriction or limitation of any kind whatsoever.
>
> THIRD: I give, devise, and bequeath all my real estate and especially that which I acquired from my father, George W. Ball, by deed dated September 27, 1935, and of record in Deed Book 24 at page 64 to my kindred in parcenary, male and female, in accordance with the Virginia Statute of Descent and Distribution [sic], § 64–1 of the Virginia Code as

amended, SUBJECT, HOWEVER, to a life estate in all the real estate in favor of my friend Lena Davis.

He also appointed "my friend Lena Davis" as executrix, requesting qualification without surety on her bond.

The precise issue therefore is whether the collateral descendants of the testator or his wife constitute his "kindred" under the will. If the former, all the collaterals take as testator's devisees; if the latter, the complainant takes as devisee of Lena Ball. Resolution of this question requires determination of the testator's intent.

The common law had a highly developed system of descents with respect to intestate succession to real estate, the principles of which are set out and discussed fully in W. Blackstone, 2 *Commentaries on the Laws of England*, c. 14 (Fac. ed. 1979). There it is asserted that common law principles of inheritance stem from the feudal system and vary greatly from inheritance under both the Jewish and Roman law. The foundation and heart of common law descents was the concept of kindred, which the author equates with consanguinity and defines as *vinculum personarum ab eodem stipite descendentium* (the bond of persons descended from the same tree or stock). *Id.*, at page 202. Kindred means relatives by blood. *Bonewell v. Smith*, 120 Va. 431 (1917).

Nevertheless, it is within the competency of the legislature to change the course of descents, *McFadden v. McNorton*, 193 Va. 455 (1952), and in this Commonwealth, the subject has been fully determined by the legislature, *Williams v. Knowles*, 178 Va. 84 (1941), to the extent that the common law course of descent has been wholly superseded and abrogated, *Medley v. Medley*, 81 Va. 265 (1886). The legislature has exercised its prerogatives numerous times to change the course of descents, and in such events, the settled law is that the statute in force at the time an intestate dies controls the course by which his real estate shall descend and be inherited. *Dillard v. Tomlinson*, 15 Va. (1 Munf.) 183 (1810); *Hauenstein v. Lynham*, 69 Va. (28 Gratt.) 62 (1877).

At common law, devolution of real estate was literally by descent and never by ascent. Thus, intestate succession to realty was by devolution to the issue of the decedent (giving preference to the male over the female, and as among males, giving preference to the eldest); but where the decedent left no issue, devolution was by descent to the issue of an ancestor of the decedent, and while it was necessary to

track back to the ancestor to determine to whom the property should descend, the property never ascended to vest in an ancestor, contrary to Jewish, Greek, and Roman law. *See generally*, Blackstone, *supra*, pages 208, *et seq.*

The first Virginia statute of descents enacted in 1785, the chief architect of which was Thomas Jefferson, radically changed this letter, as well as other common law concepts, such as primogeniture, of descents. *See generally*, C. Morrisett, "Legislation of 1922," 8 *Va. Law Reg.*, N.S., 81, 84 (1922). By this statute, real estate of an intestate decedent as at common law did descend first to his lineal descendants. In default of issue, the property "descended," actually ascended, to the decedent's father, but if none, in equal shares to the mother, brothers and sisters, and descendants of the last two by representation, and if none, then to the next previous generation up the tree, and so on, but giving preference in each instance to the ascending male line.

Another radical innovation on the common law was with respect to surviving spouses. The common law concept of descents was based on consanguinity, and lands could descend only to the kindred, that is, blood relatives, of the decedent. For that reason, surviving spouses were foreclosed from inheriting, though, of course, they were entitled to an interest in the decedent's realty by way of curtesy or dower. This new statute radically altered the common law and, by force of legislative will, the meaning of words by making surviving spouse "kindred" of the decedent. Who is to say that the legislature, subject to constitutional inhibitions, when it uses a word cannot, like Lewis Carroll's Humpty Dumpty, make a word mean exactly what it chooses the word to mean? True, this initial statute made the surviving spouse eligible to inherit only if no lineal, ancestral, or collateral kindred could be found, but at least the concept of a surviving spouse inheriting land and thus of necessity being deemed a blood relative, a kindred, was born.

So the statute remained until Acts 1922, page 861, which raised the status of a surviving spouse from the last category to the fourth category in the line of descent, following children and their descendants, parents, and brothers and sisters and their descendants. (It also abolished the preference to the ascending male line, putting male and female ancestors on the same footing.) Morrisett, *supra*. Except for certain amendments by Acts 1923, page 166, the statute remained the same until by Acts 1956, c. 109, when the "surviving consort of the intestate" was moved in the line of succession from fourth to second

place, taking the whole of the realty if there existed none in the first class, being children and their descendants; and there the surviving consort remained in the line of succession and was at the time of the testator's death, the description being changed by later amendment to "surviving spouse."

As of decedent's death in 1961, the statute expressly stated the anomaly of a surviving spouse being a blood relative by providing in its preface that real estate of inheritance as to which one died intestate "should descend and pass in parcenary to such of his kindred, male and female, as are not alien enemies" in a course of descents which included that spouse. § 64-1, Va. Code 1950, Vol. 9, 1956 Cum. Sup.

But more recently the surviving spouse has been advanced conditionally to first place. This history is a classic example of the many evolutions found in Anglo-American jurisprudence. Initially, the surviving consort was at common law wholly excluded from the possibility of succeeding to real estate by descent. After long centuries, the Virginia statute of 1785 made the surviving consort a potential heir but last in line and only where no other heir could be found. One hundred thirty-seven years later, in 1922, the surviving consort was advanced from last to fourth place in the course of descents. So matters remained until 1956 when the surviving consort was again advanced, to second place immediately below children or their descendants. Then by Acts 1982, c. 304, the surviving spouse was advanced to first place in the line of intestate succession to real estate unless the intestate left children or their descendants who were not the issue of the surviving spouse, in which event that class would stand first in succession. Seemingly, the only possible progression left would be to place the surviving spouse unconditionally first in the line of succession.

At the time of writing his will in 1961 and at the time of his death in 1962, the statute of descents was the same, and at neither time did he have surviving children or parents, but collaterals only. Had he died intestate at either time, the only operative difference would be that he had no surviving consort at the earlier date and his realty would have passed to the collaterals in the fourth course of descents, and, if at the latter date, he had a surviving consort who would succeed to his lands as the member of the second category in the course of descents, taking in preference to those in the fourth class.

But the decedent did not die intestate and so his lands pass not by the statute of descents but by devise under his will. The anomaly in

this case is that he devised his land but expressed the clear intent that it be devised in accordance with the statute of descents, inartfully referring to the "statute of descent and distribution." As the decedent was devising real estate and not bequeathing personalty by Clause Third (although he also inartfully said "devise and bequeath [*sic*] all my real estate"), and as the statute of descents and that of distribution, § 64–11, Code 1950, are not consistent in their designation of classes of beneficiaries, the Court determines he intended to mean the statute of descents only. In addition, he expressly refers to § 64–1 (descents) and not § 64–11 (distribution).

As attested consistently by great numbers of cases in the construction of wills, the cardinal rule is to determine the intent of the testator and to give it effect if it is not inconsistent with a rule of law. 20 M.J., *Wills*, § 77. Consequently, the primary responsibility of the Court in this case is to determine which one of two possibilities represent the true intent of the testator: Whether at the time of executing the will, he intended his real estate to pass under the statute of descents to his collateral heirs existing at the effective date of his will, together with those who in the interim might have become such through representative succession, or whether he intended his real estate to pass under that statute to someone who was not at the time a collateral or a kindred and who at his death by operation of law had become a "kindred" as a result of his marriage to her. Put another way, does this testator's will speak as of the date he executed it or as of the date he died? In the Court's opinion, the former is the case.

If the will speaks and takes effect as of the date of the testator's death, then his real estate was devised to his then wife. It is not difficult to find statements in cases and text books stating that a will speaks as of the time of the testator's death, but such statements are often general and unqualified as to what purpose or purposes the will speaks as of the date of its maker's death. The rule, at times so casually stated, is limited in application in two respects. First, it has application only to the testator's intent with regard to what or how much property in the estate at his death is to be encompassed in his testamentary disposition. Second, it does not apply where a contrary intent is manifest in the will. This principle of construction is statutory and deals with the question of after-disposed of and after-acquired property of the testator.

Section 64–62, Code 1950, in effect at testator's death and now unchanged as § 64.1–62, Repl. Vol. 1980, provides as follows:

A will shall be construed, *with reference to the real and personal estate comprised in it*, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will. (Emphasis added.)

Following statutory enactment allowing devise of real estate by will, which previously could not be done at early common law, the will was operative as to all personal estate which the testator possessed at his death but operative only as to real estate which he possessed at the time of execution of his will and not operative as a devise of real estate acquired after the date of its execution. Blackstone, *supra*, 378 and 379. Thus § 64–62 is in part declaratory of and in part changes the common law, *Wildberger v. Cheek*, 94 Va. 517 (1897), and its effect is to abolish the common law distinction between the operation of wills on after-acquired personal property and on after-acquired realty. *Kent v. Kent*, 106 Va. 199 (1906). The common law background against which this statute was passed clearly shows the general principle that the will is construed to take effect as if executed just prior to death is a rule of statutory construction which relates to the property as to which the will is effective, not as to testator's intent relating to the objects of his bounty. For illustration of application of the statute, *see Carper v. Reynolds*, 211 Va. 567 (1971).

Thus the statutory rule for construction as of the time immediately before the death of the testator has no application in this case. The correct rule of construction applicable here is that the Court endeavors to view matters as the testator saw them at the time he wrote the will, the Court placing itself as nearly as possible at that time in the situation in which the testator found himself. *Baptist Home v. Mizell*, 197 Va. 399 (1955); *Warner v. Baylor*, 204 Va. 867 (1964); 20 M.J., *Wills*, § 80.

At the time the testator signed his will, he knew that he had no children or parents but only collateral kindred, a brother, and descendants of deceased siblings. His kindred constituted a class naturally objects of his bounty. Consequently, he devised, subject to a life estate, all of his real estate to them, whoever and however many there might

be at his death, using the statute of descents as the device by which they might be determined at that time.

At the time of writing the will, the testator also had a friend, Lena Davis, whom he wished to remember. She must have been a very dear friend for he left her all his personal estate, a life estate in all his realty, and made her executrix without surety on her bond. She was at that time, however, a friend and not his kindred to whom he expressly intended the remainder interest in his real estate to pass.

The Court must put itself in the place of the testator for the very purpose of determining the objects of his bounty, *Phillips v. Ferguson*, 85 Va. 509 (1888). His intent must be construed from the will as a whole, *Kling v. Virginia Trust Company*, 215 Va. 226 (1974), gathered from the words he used and not from what he might have meant to express, *Newsome v. Scott*, 200 Va. 833 (1958). Then, effect must be given to the general intent so divined, at the same time taking care to avoid if possible any repugnancies and reconciling if possible any which might exist. *Smith v. White*, 107 Va. 616 (1907); *Pitman v. Rutledge*, 198 Va. 567 (1956).

Giving effect to the general rules of construction stated above, the testator intended to devise in remainder his real estate to his then kindred or their representatives who on the effective date of the will would constitute his heirs under the statute of descents. By doing so, the Court gives effect to disposition of his real estate for life and in remainder according to the words he actually used in the situation in which he found himself. This construction also avoids setting at naught his express provision for a life estate in Lena Davis and any repugnancy that might arise between that provision and his express provision that there was to be a remainder interest in someone other than the life tenant.